Syllabus.    Statement of the case.

# HIRAM BOREN

*v.*

# HENRY M. SMITH *et al.*

1. REGISTRY LAW—*of its application to elections for the removal of a county seat* The act of 1865, providing for the registry of electors, and to prevent frauds in elections, does not apply to elections held for the purpose of deciding upon the removal of a county seat.

2. JURISDICTION—*of a court of chancery in such cases.* While a court of chancery will not interfere to determine which of two persons has been elected to office, or try the rights of parties to hold an office, yet, in case of an election upon the question of the removal of a county seat, which is claimed to have resulted in favor of removal, if it is alleged that such was not the result, by reason of the election being illegally held, or the vote not being a fair one, a court of chancery will entertain jurisdiction at the instance of those impeaching the election, to determine where the county seat is, although that inquiry may incidentally involve the question, whether the vote had been fairly taken, and if fraud had intervened therein, to purge the polls.

APPEAL from the Circuit Court of Pulaski county; the Hon. JOHN OLNEY, Judge, presiding.

This was a bill in chancery for an injunction to restrain and prevent the removal of the county seat of Pulaski county, from North Caledonia to Mound City. On the hearing, the bill was dismissed, and the cause was brought to this court on appeal. The facts are sufficiently stated in the opinion.

Messrs. DOUGHERTY & DAVIDGE, for the appellant.

Mr. WESLEY SLOAN and Messrs. MULKEY, WALL & WHEELER, for the appellees.

Mr. JUSTICE WALKER delivered the opinion of the Court:

It appears that on the 16th day of February, 1865, an act of the General Assembly was approved, enabling the citizens of Pulaski county to vote for and against removing the county seat, from Caledonia to Mound City.   This act took effect from and after its passage.   On the day previous, an act was adopted, providing for the registry of electors, and to prevent frauds in elections, which went into effect from and after its passage.   An election was held on the 13th day of March, the day named in the act; returns were made, and it was, therefrom, declared that there was a majority of 313 votes in favor of the removal.   Thereupon, this bill was filed, for an injunction to restrain and prevent the removal of the county seat, because there was no registry of the voters had before the holding of the election, and that there were more fraudulent votes cast for removal than the majority indicated by the poll books. A demurrer was filed to the bill, but overruled by the court; a hearing was had, the temporary injunction dissolved and the bill dismissed.

Was this an election specified in the registry law? It requires the board of registry to meet on Tuesday, three weeks previous to any State, county, city or town election, and proceed to make a list, &c.   The act further declares that they shall meet on Tuesday of the week preceding the election, for the purpose of revising and correcting the registry lists.   It will be observed that an election of this character is not embraced in this language.   It is not what is understood as a State, county, city or town election.   They, as all know, are for the election to fill offices of these various departments or divisions of the State government.   Had the General Assembly designed to embrace an election of this character, they would have specifically named it, as they did the others, or employed language sufficiently comprehensive.   Had the act declared that the registry should be made before any or all elections, a different question would have been presented. When there are other elections authorized and required by the

law, than those enumerated, and when they have specified a portion only, we must conclude that those not named were intended to be excluded from the operation of the law. This is the natural and reasonable interpretation, and accords with the received canons of interpretation.

We now come to the question of fraud, and, having found the abstract so meager and imperfectly made, we have been compelled to read the entire bill of exceptions, to learn what the proof was on the hearing in the court below. No portion of the evidence introduced by appellee has been printed in the abstract, and but a meagre statement of that of appellant. The rule in reference to abstracts has been entirely disregarded in this case, and the record being voluminous, and not well prepared, a large amount of unnecessary labor has been imposed upon the court, which would have been avoided if the abstract had even been an index to the record. After a careful consideration of the evidence, we are of the opinion that appellant has failed to establish that fraudulent votes were cast, to a greater number than the majority returned. He has, no doubt, established that fraudulent votes were cast, but not to that extent.

The judges of election testify that the election was fairly conducted by them; that they permitted no person to vote unless they knew him to be a legal voter, or the fact was proved. A number of well-informed persons state that the white population of the city was, at that time, between four and five thousand, and none place it at less than from three to four thousand. It does not appear that the vote was extraordinarily heavy for such a population. And, when it is remembered that the vote at the preceding election, in November, was four hundred and forty-six, and no one denies that it was a fair election, and when witnesses state that the population had increased, it would not seem to be a violent presumption to conclude that there was, at least, that number of legal voters at this election. And the deputy postmaster

swears that he knows 449 of those who voted, to be residents of the city, and entitled to vote, and his brother, the postmaster, swears to 401 that he knows were entitled to vote. If this' was the only evidence, and the balance of the votes were excluded, still it would leave a majority of the votes in favor of removal.

The poll books, however, must be regarded as controling evidence, until overcome by satisfactory proof. In behalf of appellant, several witnesses state it as their belief that there were not exceeding three hundred legal voters in the city at the time the election was held. This character of evidence is not sufficient to contradict the poll books, and the election of three months previous shows that there were, then, fifty per cent. more than they suppose. And the number of illegal voters proved does not, perhaps, reach a hundred. And the fact that some of the witnesses were unable to remember more than two hundred and twenty to fifty of the persons whose names were on the poll books, as residents of the city, is not evidence requiring the vote to be reduced to that number. Witnesses might, no doubt, have been found who did not know fifty of the voters. And the fact that the sheriff found but a few of those that were named in the subpœna, although evidence, was not of that forcible character necessary to strike all of their names from the poll books. From his evidence, we infer that he made no great effort, as he only speaks of having inquired of the postmaster, who was unable to direct him where he would find them. He does not state that he made inquiry of others, and seems to have been easily satisfied to return the subpœna not found. So, whether the evidence be considered separately or collectively, we deem it insufficient to sustain the bill.

It was urged that the court below had no jurisdiction to entertain the bill. It is, no doubt, true that a court of equity will never interfere to determine which of two persons has been elected to an office, or to try the rights of parties to hold

an office, as, in such cases the law has afforded adequate and appropriate remedies, still this is not a mere contested election. It is to determine where the citizens of a county have the legal right to transact public business. It is true, it may incidentally involve the question whether the vote has been fairly taken, and if fraud has been committed, to purge the polls.

Our constitution has declared that such a vote shall be taken before a county seat can be removed. And in making that provision, it is manifest that it was designed that the will of the majority of the legal voters of the county should control. It would defeat that object, and render this fundamental provision inoperative, if the sense of the majority of the legal voters, constitutionally expressed, might be overcome by illegal voters, or other fraudulent means. And as the constitution, and the law, have failed to afford a specific remedy to prevent this provision from being defeated, it is eminently proper that equity should afford the requisite relief in such cases. As there is no law in England similar to this provision of our constitution, and the organic laws of other States are believed to have no such provision, it is not to be expected that precedents may be found upon which to base the jurisdiction of a court of equity. But if our courts of equity were, in the absence of legislative action, to refuse relief, this constitutional provision could, by fraud, be rendered inoperative and wholly defeated. The decree of the court below is affirmed.

*Decree affirmed.*