Syllabus.

# BOARD OF SUPERVISORS OF KNOX COUNTY *et al.*

*v.*

# GEORGE DAVIS *et al.*

1. CONTEST OF ELECTION—*removal of county seat—who may contest.* On bill in chancery by a citizen and voter of the county, who was also a tax-payer, filed in behalf of himself and all others of the county interested in the question, against the board of supervisors, to impeach the election returns and purge the poll-books of illegal votes cast at an election to determine whether the county seat should be removed, it was objected on appeal that the suit could not be maintained by a private citizen, but should have been brought by the attorney general or State's attorney on behalf of the public: *Held,* that, from the long practice in this State allowing such suits to be brought by individuals, this court could not reverse the rule, especially as no such objection was made in the court below.

2. JURISDICTION—*chancery—waiver of objection.* It is the practice in this court, when no objection is made to the jurisdiction of the court below, not to entertain the objection when raised for the first time in this court, unless it be in cases where chancery could under no circumstances have jurisdiction of the case. The defendant, by failing to object in due time in the court below, will waive the objection.

3. ELECTIVE FRANCHISE—*depriving a few of, does not render election void.* Article 6, section 1, of the constitution of 1848, declared that every white male citizen, above the age of 21, who had resided in the State one year next preceding the election, should be entitled to vote at such election; and every white male inhabitant, of the age aforesaid, who resided in the State at the adoption of the constitution, should have the same right to vote; and then provided that no citizen or inhabitant should be entitled to vote except in the district or county in which he should actually reside at the time of such election. The election law of 1861 provided that no person should be entitled to vote at any general or special election unless he should have actually resided in the election precinct 30 days immediately preceding such election; and the charter of Galesburg, which regulated elections in that city, required six months residence in the city and 30 days in the ward, preceding an election, to entitle the citizen to vote: *Held,* on bill to contest an election for the removal of the county seat of Knox county, that the fact that some legal voters under the constitution were deprived of their right of suffrage under such laws, did not render the election void; but that if the laws were restrictions on the right of suffrage, it was a wrong to the elector who was deprived of his vote, for which he had a complete remedy against the judges of election.

4. ELECTION—*removal of county seat—donations to influence the vote.* A statute which directed a vote to be taken in Knox county, on the question of removing the county seat from Knoxville to the city of Galesburg, also authorized the city and individuals to raise and secure funds requisite for the public buildings, and declared the subscriptions and donations made for that purpose valid and binding in case the vote should be in favor of the removal. On a contest of an election held under such law, it was contended that this law was unconstitutional, in holding out inducements in the shape of a bribe for votes in favor of the change: *Held,* that if the law was unconstitutional, it was so only so far as to render the subscriptions and donations void, and no further; that the balance of the law being constitutional, the election under it was not void, and that the courts had no power to relieve against the effects of the inducements which may have operated favorably to the removal.

5. SAME—*registry.* On the contest of an election for the removal of a county seat, it was urged that the election was void, because no registry of the voters of the county had been taken: *Held,* that the general registry laws of the State had no application to elections of this character.

6. SAME—*polls held open until midnight.* In the same case the common council of Galesburg required the polls within the city to be opened at eight o'clock A. M. and kept open until midnight of the day of this election, and this was urged as a fraud: *Held,* that, as under the general laws of the State the judges of election were empowered to keep the polls open until twelve o'clock at night, if deemed necessary, and as the common council had the general power to regulate elections in the city, they might make this discretion compulsory; and that, in the absence of proof of an evil intent, no fraud could be presumed, but rather a desire to afford all an opportunity to vote.

7. SAME—*rejection of poll-books of a town for fraud.* Where it appeared, on the contest of a vote for the removal of a county seat, that the judge and clerk of the election in a town had acted fraudulently in registering the votes as they were keeping the lists, and in making fraudulent returns, and that they knowingly allowed illegal votes, and many persons to vote several times, and even minors to vote; and where the vote returned was double the vote ever cast before in the town, and the evidence showed that heavy frauds were practiced, the judge and clerk participating therein, the court below rejected the poll-books and returns from such town, for all purposes, except to show that an election was held, leaving it to be shown by proof who in fact voted and how such votes were cast: *Held,* that the court did not err in rejecting the books and returns on account of the fraud.

8. SAME—*poll-books prima facie evidence.* Although there may be some fraudulent voting at an election in a town, yet, where the officers conducting the same are not participants in it, but endeavored to hold the election

according to law, their returns are *prima facie* evidence of all they contain, subject, however, to be corrected by proof; but where their returns are successfully impeached for fraud in them, they are unworthy of credit, and are evidence of nothing except that a poll was opened.

9. NATURALIZATION *of foreigners—jurisdiction of county court.* Under the laws prior to the adoption of the constitution of 1870, the county courts of this State had no ·jurisdiction under the act of congress to admit persons of foreign birth to citizenship.

10. CONSTITUTIONAL LAW—*when part of a statute may stand.* Although a part of a statute may be in conflict with the constitution, and therefore void, yet the whole statute will not be pronounced void if the other provisions are complete in themselves, and may be executed without regard to the obnoxious portion.

APPEAL from the Circuit Court of McDonough county; the Hon. CHAUNCEY L. HIGBEE, Judge, presiding.

This was a bill in chancery, by George Davis, in the circuit court of Knox county, against the board of supervisors of Knox county, and others, to impeach the election returns and purge the poll-books of illegal votes cast at an election for the removal of the county seat of Knox county. The venue was changed to McDonough county, where a decree was rendered, finding that a majority of the legal votes cast was for removing the county seat of Knox county from Knoxville to Galesburg. The record is very voluminous, and the conclusion of facts from the evidence, so far as relate to the points discussed, will be found in the opinion.

Messrs. CRAIG & HARVEY, Messrs. EGAN & TEMPLE, and Messrs. BECKWITH, AYER & KALES, for the appellants.

Messrs. McKENZIE & WILLIAMS, and Mr. T. G. FROST, for the appellees.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was a suit in equity, brought by appellees, in the circuit court of Knox county, against the board of supervisors,

to impeach the election returns and to purge the poll-books of illegal votes cast at an election to determine whether the county seat should be removed from Knoxville to Galesburg. The bill alleges that the apparent majority against removal is composed of fraudulent votes, and that when the illegal and fraudulent votes shall be deducted, there will be a decided majority in favor of removal; and prays that the court may declare, by decree, that the election did result in favor of removal of the county seat to Galesburg. The venue of the case was afterwards changed to the McDonough circuit court. The case was heard in that court, and the relief asked was granted; and the case is brought to this court, and a reversal asked, on various grounds.

It is first urged that the decree should be reversed because the suit was not instituted in the name of either the Attorney General or the State's attorney of the circuit; that a private individual has no power to inaugurate such a proceeding. In support of the objection, numerous decisions of other States are referred to, as well as the practice in Great Britain. We are not disposed to doubt that such is the practice in other jurisdictions, but in this State a contrary practice has prevailed, unchallenged, for many years, and in a considerable number of cases.

The first of these cases arose under the constitution of 1848, in this court, and was *The People ex rel.* v. *Marshall,* 12 Ill. 391. That was an information, asking the court to compel the circuit judge to hold court at a place which the general assembly had endeavored to abolish as a county seat by an act passed by that body. It declared the county itself should be abolished, and the territory attached to another county. The relation was by a private person, who simply alleged that he was a citizen and a voter of the county, not even alleging that he had any business to be transacted in the court. The information was not in the name of the prosecuting attorney, nor does it appear that he consented that the proceeding might be

instituted, nor does it appear that he was or acted as an attorney in the case, and still the relief was granted.

The next case was that of *Turley et al.* v. *The County of Logan,* 17 Ill. 151. That was a case involving the removal of the county seat. At the election the vote resulted in favor of removal, and a number of private citizens filed a bill to prevent the county officers from erecting county buildings at the new location. The case was tried in the court below, and was considered in this court on the legal propositions presented by the record, and no exceptions taken to the mode in which the proceeding was commenced, although the State's attorney neither joined in the bill, gave leave to file it, nor appeared as counsel in the case.

The next was the case of *The People ex rel.* v. *Warfield,* 20 Ill. 159. It was an application for a writ of *mandamus,* and, although the writ was refused, it was on the ground that one Carnes, a citizen and tax-payer of the county, had filed his bill to contest the result of an election to remove the county seat, and the court of chancery having acquired jurisdiction, this court would not interfere whilst that suit was undetermined in that forum.

The next case was *Robinson* v. *Moore,* 25 Ill. 135. It only decided that the question as to the place where a county seat was located, could only be settled in a direct proceeding, but not collaterally.

The case of *The Board of Supervisors* v. *Keady,* 34 Ill. 293, was a bill in chancery, filed by private citizens of the county, to prevent the board of supervisors from taking further steps for the removal of the county seat, in pursuance of a vote of the people of the county. On the hearing in the circuit court, a perpetual injunction was decreed, and on a hearing in this court, the decree was affirmed, on the ground that the vote was had before the law under which it was held had taken effect. We, however, in that case, said we desired to be understood as not expressing any opinion as to the mode in which the question was brought before the court. We also,

in that case, referred to several adjudged cases which hold that such a proceeding must be by some officer who represents the people.

In the case of *Boren* v. *Smith,* 47 Ill. 482, there had been an election held to determine whether the county seat of Pulaski county should be removed to Mound City. On a canvas of the vote, a certificate was given that the election had resulted in favor of removal, and a private person filed a bill for an injunction to restrain a removal. Neither the Attorney General nor State's attorney was a party or attorney in this proceeding. The case was heard in the circuit court, and was brought to and tried in this court. In that case, it was urged that the court below could not entertain jurisdiction of a bill in chancery for the purpose of correcting the polls and returns of the officers, to obviate the effects of fraud, accident or mistake; but this court held that equity would take jurisdiction, and, when necessary, afford relief. An application of this kind is unlike the contest in an election for an office, as in that class of cases the statute has provided the manner of contesting, and the remedy is complete at law. Hence, the case of *Moore* v. *Hoisington,* 31 Ill. 243, has no application to the present case.

The case of *The People ex rel.* v. *Wiant,* 48 Ill. 263, was an application for a writ of *mandamus* to compel the county treasurer to remove his office to the town of Wheaton, to which town it was claimed the county seat had been removed by a vote of the citizens of the county. The Attorney General or State's attorney's name did not appear in the proceeding as party or attorney, but, nevertheless, the court entertained jurisdiction, issued an alternative writ, and tried the case on the return. And, in that case, as in Warfield's case, the relief was refused, on the ground that a bill in chancery was pending in the circuit court, where, the court having jurisdiction, full and complete justice could be done.

Whilst it is true, in none of these cases was the question presented whether such a bill might be filed by a citizen of

the county, still the right was tacitly recognized, and has been understood by the profession as the settled practice. It is true, in the case of *The Board of Supervisors* v. *Keady, supra,* the practice was doubted, and authorities were referred to announcing a different rule, but, nevertheless, the court heard and determined the question as though the suit had been instituted by the attorney for the State. The practice of so filing bills in these cases has obtained unchallenged so long, and in such a number of cases, that we feel that we would be unwarranted now to wholly reverse the practice. Parties, on the faith of what has been understood to be the settled practice, have instituted and prosecuted this suit at large expense. It has necessarily been attended with much delay, and at no step in the progress of the case, from its first inception until it reached this court, has any objection been made to the manner in which the suit was brought. Under such circumstances it would be harsh to overrule the practice, and tax complainant with heavy costs, when he had every reason to suppose, as all others did, that his course was fully warranted by long and uniform practice in our courts. Again, it is the practice of the court, where no objection is made to the jurisdiction of the court below, not to entertain the objection when raised for the first time in this court, unless it be in cases where chancery could under no circumstances have jurisdiction of the case: *Stout* v. *Cook,* 41 Ill. 447; *Dodge* v. *Wright,* 48 Ill. 382; *Hickey* v. *Forristal,* 49 Ill. 255. Even if the better practice required the suit to be brought by the attorney for the people, still, in accordance with these decisions, as the question was not raised in the court below, it can not be in this court.

We, then, must hold that, although it might have been the better practice to require bills in such cases to be exhibited by the attorney for the State, still, if not so brought, the defendant should have objected by a demurrer in the court below, or be considered as having waived the objection.

It is next urged that the election was void because the law regulating the manner in which it should be conducted required it to be held in the several towns by the same officers and governed by the same rules as the elections in such towns are held for town officers, and in the several wards of the city of Galesburg by the same officers and governed by the same rules as elections in the city for its officers. The act of 1861, art. 5, sec. 9, of the township organization, declares that no person shall be a voter at a town meeting unless he is qualified to vote at a general election, and has been for the preceding 30 days a resident of the town where he offers to vote; and the twelfth section provides that any person who is not a legal voter shall be liable to a fine of $100, or imprisonment not exceeding six months, or both, who shall vote at a town election. The charter of the city of Galesburg declares that no person shall vote at a city election unless entitled to vote at State elections, and has been a resident of the city six months preceding the election, and an actual resident of the ward in which he offers to vote ten days next preceding such election. The general election laws of the State (Sess. Laws 1861, p. 268) provide that no person shall be entitled to vote at any general or special election unless he shall have actually resided in the election precinct 30 days immediately preceding such election, and declares that if any person not qualified shall vote at such election, on conviction he shall be confined in the penitentiary for any term not less than one nor more than five years.

The seventh article, section 5, of the constitution of 1848, provides "that no county seat shall be removed until the point to which it is proposed to be removed shall be fixed by law, and a majority of the voters of the county shall have voted in favor of its removal to such point." Article 6, section 1, of the same instrument, declares that every white male citizen above the age of 21, who has resided in the State one year next preceding the election, shall be entitled to vote at such election, and every white male inhabitant of the age

aforesaid, who resided in the State at the adoption of the constitution, shall have the same right to vote; "but no citizen or inhabitant shall be entitled to vote except in the district or county in which he shall actually reside at the time of such election."

It is insisted that these constitutional provisions secure to every elector the right of suffrage that can not be limited or abridged by the general assembly; that the enactments which superadd 30 days and six months residence, as additional qualifications, are all repugnant to this constitutional provision, and are void. But, conceding them to be unconstitutional and void as preventing a free election, does it follow that this and all other elections held under these laws are void? If so, no elective officer in the State has been constitutionally and legally elected since the passage of the act of 1861. If this election was void, then all persons holding or claiming to hold such offices have been usurpers since that time. To give such an operation to this provision of the constitution would be anomalous, and perhaps fraught with disastrous consequences. If these are restrictions on the right of suffrage, it is a wrong to the elector, for which he has a complete remedy against those who, under a void law, deprive him of the right. And it may possibly be that the judges of election have disregarded these provisions and permitted every legal voter to exercise the right, notwithstanding these limitations; but even if they have refused the right, we can not, in the absence of fraud, hold that it could affect the result of the election.

No one, we presume, would ever contend that because the judges of election, in one or a number of cases, in the different precincts of the county, should violate the constitutional guaranty of free elections, by illegally and wrongfully refusing to receive an occasional vote, therefore the election would be void; and in that case the freedom of the election would be as fully disregarded as in this, where comparatively but few voters have been deprived of their rights. To give the effect

contended for to these provisions, would most effectually prevent the election of most if not all officers. If simply the refusal to receive a legal vote should be held to be a violation of the freedom of the election, so as to render it void, but few offices would be filled, and the majority would be thus indefinitely deprived of their choice by the wrong decision of a question about which men might well differ. Constitutions are made for the organization of government, that the people may have protection to life, in the enjoyment of their civil and political rights, and in the possession and enjoyment of their property; and such instruments, to accomplish the purpose of their adoption, must have a practical operation. The constitution and laws do not, in terms, and, we think, do not in spirit, require that where an inconsiderable number of electors have been deprived of their rights to participate in an election, it shall be held void, and to so hold would defeat the very purpose of holding elections.

Had the law attempted to exclude entire precincts, wards or political divisions from participating in the election, then a more serious and important question would have been presented for determination; but if that question should ever be presented, it will then be considered and decided.

It is next urged that the law authorizing the election is unconstitutional, because it authorized the city of Galesburg and individuals to raise and secure funds requisite for the public buildings, and the subscriptions and donations made for the purpose to be valid and binding, in case the vote should be favorable to removal, and void if otherwise; that when such a fund was raised, it operated largely and unduly upon the voters of the county to induce them to vote for removal; that many were probably thus induced to vote for the change who would have opposed it had the expense for the purpose fallen on the county by taxation; that the law and the subscriptions under it gave those favorable to the removal a great and unjust advantage in the election; and that the law operated in the nature of an offer of a bribe for

votes in favor of removal, and, for that reason, the election should be regarded as inoperative and void.

If this law is unconstitutional, as suggested, it is only to the extent and no further than to render the subscriptions and other donations inoperative. The remaining portion of the law is, so far as we can see, strictly in conformity with the fundamental law. Because the law may be unconstitutional in one of its provisions, it does not follow that the entire law must fail. · Strike out this provision, and all of the other provisions could be executed as effectually as if it was retained; and when that is the case, the law must stand.

Even if it was conceded that the legislature had no power to authorize such subscriptions, and that by doing so it may have operated favorably to removal, we are at a loss to discover how we can relieve against its effect. Suppose the two houses had passed a joint resolution requesting the electors to vote in favor of removal, and the proposition had carried, could any one contend that such action, although manifestly outside of their duty, would defeat the operation of the law? We think not. Or suppose the general assembly had in the act provided for erecting the county buildings from funds in the State treasury, could it be said that would have rendered the election void? We are unable to see that this provision of law, whether constitutional and valid, or repugnant to the organic law and void, can, in the remotest degree, affect the legality of the election held under the law. The judicial department can not say that because this provision may have induced some of the electors to cast their votes in favor of removal, therefore, the election must be regarded as void because of legislative influence on the voters of the county. That body is vested with large and important functions, only controlled by constitutional limitations, and neither of the other departments have any power to control their action, so long as they act within the scope of their power; and we can not declare this election void even if this provision had the effect claimed.

It is urged that this election was held without a registry of the voters of the county having been taken, and that for that reason the election can not be sustained. This question was before us in the case of *Boren* v. *Smith, supra,* where it was held that the general registry laws of the State had no application to elections of this character; and we see no reason for changing the decision there announced.

It is next urged that the common council of the city of Galesburg, under the general power to regulate elections in the city, had required the polls to be opened at eight o'clock in the forenoon and kept open until midnight on the day of this election; and from this action of the common council, it is urged that fraud in this election should be inferred. We fail to see that the common council transcended their power in the adoption of this ordinance. Under the general election laws of the State, the judges are empowered, if they deem it necessary, to keep the polls open until twelve o'clock at night. The judges have this discretionary power, and if they should exercise it, we could not infer fraud therefrom; and the law invested the common council with the power to make it compulsory, and having done so, we will not hold that it implies a fraudulent design. We will, in the absence of proof of an evil intent, presume the common council were actuated by a sense of duty in affording all the voters of the city ample time and opportunity of exercising the right to vote for or against the proposition.

We now come to the consideration of the question as to the action of the court below in excluding the poll-books of the town of Knoxville on the ground that the judge and clerk had acted fraudulently in registering the votes as they were polled, in keeping the lists and in making fraudulent returns, and leaving appellants to prove by other evidence the number who did vote at that poll against removal of the county seat. We think the evidence shows, beyond all controversy, that stupendous frauds were committed, and that the judge and clerk of the election at that place were engaged in and parties

to the fraud; that, instead of using all reasonable and proper means to keep the ballot-box pure and uncorrupted, they were active participants in its pollution; that persons were permitted by them to vote many times during the day; that mere boys were permitted to vote, as also persons not legal voters; that persons were permitted to vote under assumed and fictitious names, and even the farce of receiving the vote of a dog was perpetrated; and finally, when the polls were returned, showing a vote of over 1500, when at no previous election had there ever been polled at that place much, if any, more than half of that number. And the vote of Knox township was thus returned at over half of the population of the town, as shown by the United States census taken more than a year afterwards.

Again, the moderator of the election has absented himself or absconded since this proceeding was instituted, so that his evidence could not be had; and the town clerk would not swear that the poll-list had not been changed—that ballots had not been put in the box and the certificate altered since the election; and he claimed the privilege of not answering, lest it might lead to his crimination. We think the evidence conclusively shows that there were such frauds on the part of the officers in conducting this election, that to receive the poll-book and certificate of the officers would be to perpetuate the fraud; that it would lead to error and obstruct justice; that truth would be stifled instead of being eliminated by its reception as evidence; that when a community and its officers enter into such a scheme of fraud, they should not, by their election returns thus made, be permitted to reap the same advantage as if honesty and fairness had dictated their course.

All the evidence on the point considered, we are clearly of the opinion that the poll-book and certificate are impeached and are utterly unworthy of credit, and should only be received to prove that a poll was opened at that place, and that citizens did vote at that poll, on that day, on the question of removal of the county seat.

27—63D ILL.

The poll-list in this case having been impeached and wholly discredited as unworthy of credit, by reason of the fraud of the officers of the election in receiving and certifying the poll-lists, what course shall be pursued in regard to the vote of that precinct? The supreme court of California, in the case of *Knowles* v. *Yates,* 31 Cal. 82, held, where the election was held at a place different from that fixed by the county authorities, it was such a fraud as required the rejection of the poll-book and certificate, and in the count of votes none of those cast at that place could be received; that, whilst it is the duty of the courts, as far as can be done, to protect the elector in his rights, the interest of the public should not be sacrificed for the purpose of avoiding a wrong to the individual voter; that where the people select election officers, and they disregard their duty, and aid in committing frauds on the election, the voter must be responsible for the conduct of the officer, to the extent of losing his vote, although he may be innocent of fraud.

But the court below adopted a different rule. On the hearing, the chancellor received the poll-lists and return only as evidence that an election was held in the town of Knoxville, and rejected it as wholly unworthy of belief as to other questions. The court then permitted appellants to show, by extrinsic evidence, how the various votes were in fact cast, and counted the votes thus proved as legal and proper. This is certainly all that appellants have a right to claim. A court of equity, in such a contest as this, can not close its eyes to the fact that the election officers were perverting their powers, and were using their official position to commit a fraud on the election, and can not give effect to the return, and can not go further than to count the votes as they are proved to have been given. In this the court below certainly went as far as equity can sanction; and appellants have received fully as much as they can claim, if not more than the strict legal rules could award to them.

The court decided correctly in holding that no votes could be counted from that precinct but such as were proved by satisfactory evidence that they were actually cast, and whether for or against removal. This afforded the means of fully establishing how every legal voter in the town actually cast his vote; and it at the same time cut off illegal votes, repeaters and all frauds on the ballot. It is true that it involved labor and expense, but the officers whom these same votes had placed in position to hold their elections perpetrated the fraud, and it is the misfortune of their constituents, and they should not be permitted even to make such proof if it were not that others have an interest in the question of where the county seat shall be permanently located. Were it an ordinary election, perhaps a different rule should prevail, as such permanent results would not be so likely to ensue, and as such contests are not settled in courts of equity, and the law relating thereto has made no such provision.

It is, on the other hand, insisted that there were similar frauds at the various voting places in the city of Galesburg. On a careful examination of the evidence, we fail to find that such is the fact. That there was fraudulent voting at each of these polls, is true; and it is a matter of regret that our general assembly have been compelled to impose such heavy penalties to prevent a wrong that they must have regarded so common as to only be checked by such severe punishment. But there is no evidence that the election officers at Galesburg boarded up the window so as to be unable to see each person when he presented his ballot, only leaving a small opening through which it could be passed, as was done by the officers at Knoxville. There is no evidence that they permitted persons whom they knew to repeatedly vote during the day, nor that they permitted mere boys to vote, or persons to do so under fictitious names whom they knew; and when called on to testify and to produce the poll-lists, they did so freely, fully and fairly; nor did they refuse to answer questions, lest it might lead to their crimination; and they testify that they, in

all things, endeavored to hold the election fairly and to discharge their entire duty, and believed they had, and knew at the time nothing to the contrary. Their conduct seems to have been candid and straightforward, answering all questions without hesitation. In all respects, their conduct stands in bold contrast with that of the officers who held the election at Knoxville. We fail to find evidence that can or should impeach their returns, and the court below decided correctly in receiving them as *prima facie* evidence of all they contained, subject to be corrected by proof.

We now come to the consideration whether the 63 persons of foreign birth, who, on proceedings in the county court, had obtained naturalization papers. The act of congress of the 14th of April, 1802, provides that aliens may be admitted to citizenship by the supreme, superior, district or circuit court of some one of the States, or of the territorial district court of the United States, or a circuit or district court of the United States. It further declares that every court of record, in any individual State, having common law jurisdiction, and a seal and clerk or prothonotary, shall be considered as a district court within the meaning of the act. Then, does our county court, as organized, come within this provision? Or, does it require a court which, from its organization, has a more extensive and enlarged jurisdiction?

The county court has a seal, a clerk and is a court of record, and to that extent answers the requirements of the act of congress; but has it the common law jurisdiction required? It has been, so far as we know, considered by the profession that the act required not only common law, but general common law jurisdiction, and hence it is believed but few of our county courts have assumed to exercise such jurisdiction. It is conceded that the court has but a limited common law jurisdiction. The settlement of estates, although a large and highly important jurisdiction, is not, strictly speaking, a common law jurisdiction. It, in Great Britain, was committed to the ecclesiastical courts. That kingdom, whence we draw our

common law, has not, until it may be recently, committed the probate of wills, the grant of letters testamentary or of administration, and the settlement of estates, to any of their common law courts. Hence, the jurisdiction of the settlement of estates by our county courts is not a common law jurisdiction, but is strictly statutory. It is true that such courts have conferred upon them a limited jurisdiction in the action of debt and assumpsit, when those actions lie at common law, where a guardian or an executor or administrator is a party, plaintiff or defendant, and in assigning dower to widows of deceased persons.

So far as we have been able to find, in looking through our statutes, this was the extent of the common law jurisdiction of our county courts. Thus it will be perceived that it is limited as to the character of the common law actions, and the amount of the recovery, as well as to the persons who may sue. Hence, it is limited as to the action, the person and the amount, and is in no sense general in its common law jurisdiction.

It was said, in the case of *Mills* v. *McDade*, 44 Ill. 194, " that a fair and reasonable construction of the act of congress requires us to hold that only a court of record for general, and not for special purposes, was intended to be embraced. That act has not declared that a court of record for some purposes shall be vested with such jurisdiction." So, for the same reason, we must hold that where, although a court of record, if it only has common law jurisdiction in three common law actions, and two of them limited in amount, it is not such a court as was contemplated by the act of congress. Where it declared that it must have common law jurisdiction, it can not be that it was designed to confer the power on a court having a seal and clerk which could only exercise the smallest fragment of common law jurisdiction. The court intended to be embraced was one that exercised a general, although it might be a common law jurisdiction limited as to the sum or amount in

controversy, and it may be where some kinds of actions are excluded:

We are therefore of opinion that the county court did not have jurisdiction to admit these persons to citizenship, and their votes should have been rejected.

As far as we have been able to determine from an examination of this voluminous record, the court below did not err in votes it counted in favor of removal. But rejecting the 63 votes of these persons not naturalized, there was still a majority of over 100 in favor of removal. In canvassing the vote, we are of the opinion that the court below allowed in the count all the votes at Knoxville which were proved to have been cast against removal.

An examination of the entire record has failed to disclose any error for which the decree should be reversed, and it is therefore affirmed.

*Decree affirmed.*

Mr. Chief Justice LAWRENCE took no part in the decision of this case.