[No. 13153. In Bank. — September 3, 1889.]

STEWART M. GIBSON, RESPONDENT, v. BOARD OF
SUPERVISORS OF TRINITY COUNTY, APPEL-
LANT.

80  359
e143  341

ELECTION CONTEST — BALLOTS — EVIDENCE — POWER OF COURT TO ORDER
BALLOTS PRODUCED. — In a contest over the result of an election, the
ballots are competent and material evidence of a very high order. The
court may order the clerk to produce the ballots in any contest about an
election which may be contested in the court, whether such election be
for officers or for any other purpose.

ID. — BALLOTS FOR BRIDGE BONDS. — Ballots printed for or against the issue
of bonds of a county for the construction of bridges need not have the
words "Yes" or "No" printed upon them. It is sufficient if the ballots
are printed "For the issue of bonds," or "Against the issue of bonds."

ID. — CONTEST OF ELECTION FOR COUNTY BONDS — EQUITY JURISDICTION —
CONSTITUTIONAL LAW. — Since section 18, article 11, of the state consti-
tution regulates elections to determine the policy of creating a bonded
indebtedness for a county, and no machinery is provided by law for en-
forcing the provisions of that section, the constitution by necessary
implication confers upon the court of chancery jurisdiction to protect
and enforce the will of the people by suitable and proper procedure.

ID. — PARTIES — SUIT BY TAX-PAYER. — A tax-payer is a proper party plain-
tiff in an equity suit either to restrain any illegal action which would
increase the burden of taxation, or to prevent an untrue official declara-
tion of the result of an election on a proposition to issue bonds, and to
have the true declaration made, whether the result of the election be for
or against the issuance of the bonds.

APPEAL from a judgment of the Superior Court of
Trinity County.

The facts are stated in the opinion of the court.

*James W. Bartlett,* for Appellant.

It is only an election of officers that can be contested
under the code. (Code Civ. Proc., secs. 1111–1127; *Cal-
averas County* v. *Brockway,* 30 Cal. 326–344.) An elec-
tion for the location of a county seat cannot be contested
by a proceeding in equity. (*McWhirter* v. *Brainard,* 5
Or. 426; *Gordon* v. *State,* 4 Kan. 489; Paine on Elec-
tions, sec. 268.) The court had no power to order the
ballots opened in this proceeding. (Pol. Code, secs.

1265, 1266.) An individual elector has no inherent right to constitute such a proceeding as this. This proceeding is not in the nature of a *quo warranto*. (Code Civ. Proc., secs. 803–810.) "Yes" or "No" should have been written on ballots printed "For the issue of [bridge] bonds."

*D. G. Reid,* for Respondent.

Equity has jurisdiction in cases where there is a wrong to be righted for which the law gives no adequate remedy, though the original rights be legal or the case be novel. (Pomeroy's Eq. Jur., secs. 138, 423, et seq.; *Dougherty* v. *Creary,* 30 Cal. 297; 89 Am. Dec. 116; Civ. Code, sec. 3523; Broom's Legal Maxims, 191 et seq.; *Chestnutwood* v. *Hood,* 68 Ill. 132; *Barren* v. *Smith,* 47 Ill. 482; *People* v. *Wiant,* 48 Ill. 263; *Eugart* v. *Trustees etc.,* 25 Ohio St. 618.) The ballots were sufficient under the statute, and the court had power to order them produced.

McFarland, J.—On October 2, 1888, the board of supervisors, appellant herein, made an order in due form submitting to the electors at the general election to be held November 6, 1888, the question of the issuance of county bonds to the amount of fourteen thousand dollars, for the purpose of building certain bridges. At said election more than two thirds of the qualified electors voting thereat voted in favor of the issuance of said bonds. But at several precincts a large number of ballots cast for the issue of said bonds were not counted by the election officers, so that at the canvass of the board of supervisors of the votes returned it appeared that there was not a two-thirds majority in favor of the bonds, as required by the constitution and the statute. Thereupon the board made an order declaring that the proposition to issue the bonds was lost. Plaintiff, who is a citizen and tax-payer in the county, then brought this action against the board, averring the true facts about said election, and praying that said last-named

order of said board be annulled, that the true result of said election be declared, and for such other and further relief, etc.   The defendant demurred, upon the grounds that the court has no jurdisdiction of the subject of the action; that plaintiff had no "legal capacity to sue or institute this action"; and that the complaint does not state facts sufficient to constitute a cause of action.   The demurrer was overruled, and after a denial by the court of a motion to strike out a part of the complaint, the defendant answered, admitting all the averments of the complaint, except only the averment that there had been a two-thirds majority for the bonds, which averment is denied.   The court found all the averments of the complaint to be true, and entered judgment decreeing that the issuance of the bonds was carried; that the said order of the board be annulled and set aside, and directing the board to make an order declaring that the issuance of the bonds was adopted.   From this judgment the board appeals upon the judgment roll and a bill of exceptions.

1.   Appellant contends that two errors were committed by the court during the course of the trial.   The court ordered the county clerk to produce the ballots voted at the election, and they were offered and received as evidence, over appellant's objections that they were "irrelevant, immaterial, and incompetent, and on the further ground that the court has no power to recount the ballots in this proceeding."   It is clear, however, that in a contest over the result of an election the ballots are not only competent and material evidence, but evidence of a very high order.   The real objection which appellant makes in the brief on this point is, that the court had no power to order the clerk to bring in the packages of ballots, or to order them opened, because sections 1265 and 1266 require the clerk to keep them unopened for twelve months, and then destroy them, unless there is a contest in a court about an election; and that the election

referred to in said sections means only an election for offices. But the said sections are broad enough, we, think, to include any election which may be contested in a court; and moreover, that question could arise only upon a refusal of the clerk to bring the ballots into court.

The court counted in the affirmative all the ballots which had printed on them the words " For the issue of the [bridge] bonds"; and appellant contends that this was also error. The election officers, in the precincts above mentioned, had refused to count or return any ballots which had those words on *alone*, upon the theory, it seems, that there ought to have been a double affirmative, that is, that the ballots should have been "For the issue of the bonds — Yes." (We suppose that upon the same theory the negative votes should have been "Against the issue of the bonds—*No.*") The statute provides (Stats. 1883, p. 311) that "the ballots shall be printed 'For the issue of bonds,' *or* 'Against the issue of bonds'"; and human ingenuity cannot invent a plausible pretext for refusing to count ballots so printed. The exception to this action of the court is therefore without merit.

2. But the main defense set up by appellant is, that no court, by any form of action or proceeding, legal or equitable, has any jurisdiction or authority to inquire into the result of an election on a question of the issuance of bonds; that the whole matter is beyond the scope of judicial investigation. It is said that there can be a contest in a court over the election to an office simply because the statute provides a procedure for such a contest; but that as there is no such procedure provided for a contest about any other kind of election, and as, the subject is in its nature beyond the cognizance of courts, therefore there is no judicial jurisdiction of any kind to determine any question rising out of such election. If that position be correct, then its consequences are far-reaching and alarming. In the present case, the

errors of the election officers were against the issue of the bonds, and the amount of the bonds was comparatively small. But a case entirely different from the one here presented might easily arise, involving interests of immense magnitude, and to such a case the same rule would have to be applied. Suppose that interested parties should successfully contrive to have presented to the people of a county or city a proposition to issue bonds for an unworthy purpose and to a ruinous extent; and that, although the people really defeated the project at the polls, certain election officers, either through intentional fraud or by a gross mistake, refused to return a large number of votes cast in the negative, so that the returns would show the proposition to have been carried, would there be no remedy,—no power to execute the real will of the people? There certainly would be no such remedy in the hands of the supervisors; for they can only estimate the votes returned, and have no power to count the ballots. The will of the people then can be carried out by the courts, with their power to compel evidence and thoroughly investigate, or not at all.

Without discussing generally the wide subject of what "rights of persons" and "rights of things" may be enforced in courts by means of ordinary or extraordinary actions and proceedings therein, it is sufficient to say here that the constitution of the state (section 18, article 11) has specifically provided for an election to determine the policy of creating a bonded indebtedness, and prohibited the issuance of bonds without the consent of two thirds of the voters of the county; and that whenever there is such a constitutional provision, and no machinery provided by law for enforcing it, the constitution by necessary implication confers upon the court of chancery jurisdiction to protect and enforce the will of the people by suitable and proper procedure. This principle has been declared and followed in numerous cases where constitutions have provided for the removal

of county seats; and we see no distinction, with respect to the point under discussion, between those cases and the one at bar.

In *Boren* v. *Smith*, 47 Ill. 482, which involved an election for a county seat, and where the jurisdiction of the court was attacked, the supreme court of Illinois says: "Our constitution has declared that such a vote shall be taken before a county seat can be removed. And in making that provision it is manifest that it was designed that the will of the majority of the legal voters of the county should control. It would defeat that object, and render this fundamental provision inoperative, if the sense of the majority of the legal voters, constitutionally expressed, might be overcome by illegal voters or other fraudulent means. And as the constitution and the law have failed to afford a specific remedy to prevent this provision from being defeated, it is eminently proper that equity should afford the requisite relief in such cases. As there is no law in England similar to this provision of our constitution, and the organic laws of other states are believed to have no such provision, it is not to be expected that precedents may be found upon which to base the jurisdiction of a court of equity. But if our courts of equity were, in the absence of legislative action, to refuse relief, this constitutional provision could by fraud be rendered inoperative and wholly defeated. The decree of the court below is affirmed."

In *People* v. *Wiant*, 48 Ill. 263, the court also says: "In this case the law has provided no means of contesting the election or correcting the vote then given; and if frauds were committed, and the returns do not for that reason show what was the expressed will of the voters of the county, the design of the law and the intention and desire of the majority of the county would be defeated, unless the courts can afford a remedy. This is a case unlike a mere contest of two individuals as to which

shall exercise the powers and perform the duties of an office. In that case the individuals are immediately interested and the public remotely; but in this case it is a matter of public concern to the people of the county. In that the law has afforded an ample remedy, by conforming to the statute authorizing them to contest the election, to determine which is entitled to the office, while in this no means are provided by the statute for carrying into effect the will of the majority under the law, when apparently thwarted by fraud, accident, or mistake; hence the necessity of equity to entertain jurisdiction and afford relief."

And in *Dickey* v. *Reed,* 68 Ill. 262, it is said: "Where courts of equity in this state have taken jurisdiction of contested county-seat election cases, it has been upon the express ground that the constitution had provided that county seats should not be removed, except upon a vote of a majority in favor of removal, and that the legislature in providing for such elections failed to provide any means of contesting them; and to protect the rights of the majority intended to be secured to them, it was held that the fundamental law by implication conferred the power on courts of chancery to hear and determine such cases."

Numerous other authorities could be cited from sister states; but the point has been practically decided by this court. *Calaveras County* v. *Brockway,* 30 Cal. 325, was a contest over an election for a county seat. The court took jurisdiction of the case, and held that "the determination of the board of supervisors that a place voted for received a majority of the votes cast at a special election for a county seat is *prima facie* evidence of the fact so determined, but is not conclusive; and if the fact was not as determined, it may be attacked for fraud or mistake, *and the true result ascertained."*

As before stated, we see no difference in principle between an election to determine a county seat and an

election to determine whether a bonded indebtedness shall be increased; and in our opinion, the court below had jurisdiction of the subject of the action in the case at bar.

3. Counsel for appellant states — although he does not argue — the point that plaintiff in his capacity of tax-payer had no right to institute the action.

It is clearly the law that if the action of the board had been the other way, that is, if they had declared the proposition to issue the bonds carried when in fact it had not been, plaintiff could have maintained the action. (*Schumacker* v. *Toberman*, 56 Cal. 508; *Andrews* v. *Pratt*, 44 Cal. 309; *Maxwell* v. *Supervisors*, 53 Cal. 389; *Foster* v. *Coleman*, 10 Cal. 278.) That is, a tax-payer can, beyond doubt, restrain any illegal action which would increase the burden of taxation. It is not so clear, however, when he can compel affirmative action, although it was held in *Hyatt* v. *Allen*, 54 Cal. 353, that he can by *mandamus* compel an assessor to assess property subject to assessment. It is not necessary here to determine whether or not plaintiff would be entitled to maintain *mandamus* against the board of supervisors to compel them to issue the bonds. We think, however, that, as a property owner and tax-payer, he is sufficiently a party interested to prevent an untrue, public, official declaration of the result of an election on a proposition to issue bonds and to have the true declaration made, whether the real result of the election be for or against the issuance of such bonds. No other proper party plaintiff to such an action has been suggested.

Judgment affirmed.

WORKS, J., THORNTON, J., and PATERSON, J., concurred.