Hurlbut, J.,
delivered the opinion of the court.
May 16th, 1912, appellees filed motion in this court to strike the bill of exceptions. This motion was filed twenty months after the filing of the transcript of record, and after two motions had been filed by appellees in the supreme court, both of which were heard and determined by that court; but in neither of said motions, or arguments therein, was any suggestion made as to the' bill of exceptions not being properly a part of the record. Under these circumstances, whatever rights appellees had, to have the bill of exceptions stricken from the record, were waived by them.—Murphy v. Cunningham, 1 Colo., 467; City of Central v. Wilcoxen, 3 Colo., 566; Gilpin v. Gilpin, 12 Colo., 504; Greig v. Clement et al., 20 Colo., 167; Ritchey v. The People, 25 Colo., 314.
In the last case cited it was held that after a delay of four months after filing transcript, and where two motions had been filed in the interim without suggesting in either the -absence of a proper bill of exceptions, a motion to strike bill of exceptions came too late.
*482 Nothing appears in the record before us to excuse so long a delay in filing the motion to strike. The same will be denied.
We will now consider the case as presented by the record. May 9th, 1910, in the district court of Archuleta county, appellees (plaintiffs below) filed their complaint against appellants (defendants), therein alleging that on April 5th, 1910, an election for municipal officers was held in the town of Pagosa Springs in said county, at which there was submitted to the qualified voters thereof the question as to whether or not said town should become anti-saloon territory; that the votes upon said question were duly counted, canvassed and returned by the proper authorities; that by such returns it appeared that one hundred and forty-eight votes were cast in the affirmative of such proposition, and one hundred and fifty-four votes in the negative. It was further alleged that about twenty people, naming them, voted at said election in the negative upon said proposition, all of whom were illegal voters; and that 'had it not been for such illegal votes the returns would have shown the affirmative of the proposition to have been duly carried; that all the votes cast in the affirmative were legal; that two of the judges of election fraudulently conspired together to prevent, and did prevent, certain qualified electors from voting; closing with a prayer that defendants be enjoined from issuing any saloon licenses in said town, or any licenses for the sale of intoxicating liquors; and that all such licenses issued subsequent to the election be revoked by the city council.
-To this complaint defendants filed a demnrrer, challenging the jurisdiction of the court over the subject matter, alleging that the complaint did not state facts sufficient to constitute a cause of action, and that there was a defect or misjoinder of parties defendant. The *483 demurrer was overruled, after which answer and replication were duly filed.
The question as to whether or not the district court had jurisdiction to hear and 'determine the issues formed by the pleadings is squarely presented to us for determination, and must be disposed of before considering the merits.
It is noticeable that there is no constitutional or statutory provision of this state which provides a method or procedure for testing the validity of an election held under the local option statute. The session laws of 1907, page 405, known as the local option law, while providing the manner of holding an election and voting upon the question, prescribes no method for testing the validity-thereof.
Appellants ’ position is, that no provision of the constitution, nor any legislative enactment, confers jurisdiction upon the district court under its legal or equitable powers to hear and determine this cause; that if appellee, relator, had any remedy, it was only through a proceeding in the nature of quo tvarranto; and that the local option act of 1907 is silent upon the question. On the other hand, appellees, while admitting the absence of statutory authority, contend that, under section 11, article 6, of the constitution, the district court had plenary power and jurisdiction to hear and determine this cause. Obviously the question presented is of grave importance.
The two sections of the constitution which bear directly upon the discussion read as follows:
1. Art. 6, sec. 11.
‘‘ The district courts shall have original jurisdiction of all causes, both at law and in equity, and such appellate jurisdiction as may be conferred by law. They shall have original jurisdiction to determine all controversies upon relation of any person on behalf of the people, con *484 cerning the rights, duties and liabilities of railroad, telegraph or toll road companies or corporations.”
2. Art. 7, sec. 12.
“The general assembly shall, by general law, designate the courts and judges by whom the several classes of election contests not herein provided for shall be tried, and regulate the manner of trial and all matters incident thereto, but no such law shall apply to any contest arising out of an election held before its passage. ’ ’
It has been held by the supreme court that section 11, article 6, is the only provision of the constitution which fixes the jurisdiction of the district court.—Denver Circle R. Co. v. Nestor, 10 Colo., 403.
The proceedings below were clearly of an equitable nature. The ultimate object sought was to purge the ballot of fraud, enjoin the city council from issuing any further liquor licenses, and to compel the council to revoke any such licenses issued subsequent to the election.
Section 11, quoted, purports to define the jurisdiction of district courts. It is sweeping in its terms, and the language used suggests nothing of ambiguity as to its meaning. We find nothing elsewhere in the constitution which appears to limit or qualify its jurisdiction as therein granted.- Our attention has not been called to any decision in the appellate courts of this state in which the jurisdictional powers' of the district court under this section were challenged in a case of this kind, hence, no assistance can be obtained from our own courts in determining the proposition. Many states, however, have constitutional provisions similar to section 11, and almost identical with it in phraseology, and many decisions therein have been rendered involving questions growing out of local option and other similar elections, in which such constitutional provisions have been interpreted and *485 the law as applicable thereto construed to a greater or less extent.
By reason of the absence of a provision of the constitution or statute designating a forum or tribunal with power to investigate and determine frauds and mistakes in an election of this kind, the question is narrowed to the one proposition: Did the district court, under its equity powers as granted by section 11,' have jurisdiction and power to entertain this cause and grant the relief prayed for? We think the equity doctrine upon which appellees so strongly rely should be qualified in this, that while admitting the maxim that “a court of equity will not permit a wrong without providing a remedy,” the doctrine does not apply unless the court of equity has jurisdiction to hear and determine the subject matter submitted to it. Jurisdiction is the very question now before us. If it be conceded that the district court, under its equity powers, has jurisdiction of this case, then there is no question but what it can grant full relief f-rom the alleged wrong as stated in the complaint.
Courts of equity, the same as courts of law, from the earliest times to the present, have been limited in their jurisdictional powers. When such courts were first recognized in the remote past there was an apparent disposition on their part to trench upon the jurisdiction of courts of law in proceedings wherein the subject matter had been previously cognizable only by the latter courts, and for many years there was constant friction between the two -courts as to their respective jurisdiction over the various causes of action which arose for determination. In modern times, however, such controversies have rarely arisen, as the highest judicial tribunals of England and the United States have defined the status of the respective courts as to their jurisdictions and powers: •
Another question here arises, namely: Is the di's *486 trict court, under section 11, restricted in the exercise of its equity powers to such cases or causes only as were cognizable in courts of equity prior to the adoption of our constitution? This inquiry is important in the light of decisions hereinafter cited. States having substantially the same constitutional provision have recognized the jurisdiction of the courts, under their equitable powers, to entertain and decide cases similar to the one at bar, although it was conceded that election contests between individuals for an office, and elections where propositions were submitted to the electors to be voted on, were unknown at common law, either in the courts of law or equity. Prom a careful review of those decisions, in the light óf the record before us, we think we may well sustain the jurisdiction of the district court in the proceedings below. Every consideration of justice, fairness and duty to the majority of the legal voters of the town impels us to this conclusion. The demurrer having admitted the facts well pleaded in the complaint, the charges therein contained show that ever since the election the governmental functions of the town, with reference to the liquor question, have been administered in direct opposition to the declared will of the majority of the legal voters thereof. We think a plain, natural interpretation of the language of section 11 supports the fullest exercise of the equity powers of the district court in this proceeding. It is clear from the allegations of the complaint that if jurisdiction of the district court be denied, the election was a fraud and a sham as to the majority of the legal voters of the town, as well as to all law-abiding citizens therein; and if, in the future, similar elections should be held under the local option law in other communities, and the will of the majority of the legal voters therein be nullified by fraud and unlawful acts, such as claimed here, the same condition will exist *487 there as here, and no relief can be obtained. In other words, as to whether or not this condition shall obtain indefinitely in this state, depends entirely upon future action of the legislature. If the legislature refuses to act the-people are without remedy. We do not think the framers of the constitution ever intended such a condition to prevail. It may go without saying that the average voter and citizen lias always entertained a belief that if, at any time following an election, it *could be shown that frauds were perpetrated therein, and by reason thereof a proposition in which they were vitally interested had been carried or defeated by' a majority of the legal voters, but the result had been declared against the vote of the lawful majority, there was always a door open to some judicial tribunal created and maintained by them, to which they could appeal with perfect confidence that such tribunal would give ear to their complaint and right the wrong without unreasonable delay. If we were to hold that no court exists in this state which has power to give relief against the result of a fraudulent election under the local option act, then indeed a most unfortunate condition prevails. Suppose at an election a question should be submitted to the electors for their determination; that an affirmative vote thereon would mean ruin and bankruptcy to the property of the electors; that a decisive majority of the legal voters should vote in the negative, but fraudulent votes were cast in the affirmative sufficient in number to show, on the face of the returns, the question carried, and the result so declared,— can it be that upon proper application being made by the aggrieved voters, no court could be found within the state with power to prevent the consummation of the fraud, and the destruction of their property rights, simply because no statute could be found which in terms authorized some court to give relief? We are pleased to know *488 that many courts of acknowledged celebrity lend ready ear to petitions'in such cases, and extend the benign arm of equity to shield the injured community from the effects of such frauds.
It may be well again to briefly call attention to these facts, viz.: This election was authorized by statute. It was petitioned for, called, conducted, ballots canvassed, returns made, and result declared, — all in accordance therewith. It had been held and entirely completed. After the election the council issued licenses and otherwise recognized the town as “wet” territory. The complaint charges that two of the judges of election fraudulently conspired together to prevent certain qualified electors from voting, and did fraudulently and wrongfully prevent them from casting their ballots at such election. Other fraudulent acts are charged against some of the voters, and many illegal votes are alleged to have been cast, counted and returned. The proceeding below in no way sought to enjoin, or otherwise control, the action of any official or canvassing board connected with the election. In this respect this case can be readily distinguished from the great majority of decisions cited in the briefs. In fact there is but a small percentage of the decisions that did not have to do with controlling or enjoining election officials in the performance of their duties.
Prom the earliest times courts of equity have assumed jurisdiction over all questions grounded in fraud, and have proceeded to the extreme limit of their jurisdictional powers in granting relief from the injurious consequences thereof! As equity continued to expand with the growth of civilization it unhesitatingly took cognizance of every new situation wherein the law was inadequate to give relief, and particularly in cases of fraud which injuriously affected property rights. Then why *489 should not this benign power of equity be broadened and extended so as to protect the purity ,of elections and the sacred rights of the elective franchise? Surely the rights of franchise are tantamount to those affecting property.
The multitude of decisions of the courts of last resort of this country almost without exception declare that election contests strictly speaking were unknown to the courts of common law or equity, and further that the latter ■ courts have no inherent power to try such contests. During the early days of equity jurisprudence in England, questions of public importance such as local option, bond isues, etc., were never submitted to the citizens of a municipality for their aproval. Such matters were within the exclusive jurisdiction of parliament. This fact accounts for the absence of early judicial opinions involving such subjects. For the same reason the early text writers make no mention of such elections. The practice of submitting such questions to the ballot seems to be of modern origin and sanctioned' only under a .republican form of government. If, under the early practice of courts of equity, they assumed the right to meet every new situation wherein the law was inadequate, and extend their jurisdiction to new subjects or controversies not previously known to have been of equitable cognizance, what good reason can be given why modern courts of equity may not follow the same practice? The very gravamen of the case at bar is fraud. The court is appealed to to determine the facts in issue, and if the evidence sustains the charges made it is asked to declare the truth and issue any writ or command within its power which may be necessary to right the wrong and' give effect to the will of the majority of the legal voters as expressed by their ballots. This being then a proceeding to test the validity of an election upon a ques *490 tion of local option, and such proceeding being heretofore unknown to the courts of common law or equity, the law providing no remedy, why should not a court of equity entertain the same and give whatever relief the exigencies of the case require? And particularly so as fraud is the controlling question for investigation by the court, and is a subject which has always been of equitable cognizance. There is nothing in the constitution or statutes which directly or by implication prohibits the court from assuming such jurisdiction when no special proceeding has been provided. On the contrary, the jurisdiction conferred on the district courts by section 11 should be construed as all-embracing, as its terms are unrestricted.
We do not see that the questions involved in this case are wholly political. It is settled by the great weight of authority that questions purely political in their nature cannot be heard or determined by a court exercising equity powers-. Hence, courts of equity have been denied jurisdiction or power to restrain by injunction the holding of an election, or to enjoin an election official or board from counting or canvassing the ballots, making returns, or declaring or publishing the result thereof.—Vickery v. Wilson, 40 Colo., 490; McCrary on Elections, 4th ed., secs. 387, 389; Dülon, Municipal Corporations-, 5th ed., secs. 1552, 379 (note); Cyc., vol. 22, p. 886.
The reasons generally given are that an election is a political matter, and that in most every case 'of a contested election for office the contending person has a plain remedy at law, usually by a proceeding in the nature of quo warranto, and that where questions local to the community are submitted to the electors there are generally statutes ■ providing a method by which, and a court or tribunal in which, the validity of such elections can be *491 determined. In the case at bar, there being no provision in the statute providing a forum or procedure for testing the validity of this election, any relief obtainable must emanate from the general equity powers granted by section 11, article 6, of the constitution. The authorities upon that point will now be considered.
In Mayer v. Cooper, 6 Wallace (U. S.), 247, the court, in construing a provision of the constitution of the United States similar to the one found in section 11, article 6, of the constitution of Colorado, used the following language:
“The Constitution provides, that ‘the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as Congress may from time to time ordain and establish,’ and that this power ‘ shall extend to all eases, in law and equity, arising under this Constitution and the laws of the United States.’
“The power here under consideration is given in general terms. No limitation is imposed. The broadest language is used. ‘All cases’ so arising are embraced. None are excluded.” '
To the same effect is Osburn v. Bank of the United States, 9 Wheaton(U. S.), 821.
There are many decisions defining the words “case,” “cause,” and “suit.” In Words & Phrases, vol. 2, page 1013, we find the following:
“ ‘Cause’ is defined to be, in practice, any suit or action, or any question, civil or criminal, contested before a court of justice. * * *
“ ‘Cause’ and ‘case’ are used as synonymous in statutes and judicial decisions, each meaning a proceeding in court, a suit, an action. * * *
“The term ‘cause in law,’ as used in Const. 1870, art. 6, sec. Í2, providing that the circuit courts shall have *492 original jurisdiction in all causes in law and equity, should be construed to include an action in mandamus.”
In People ex rel. Dean v. County Commissioners, 6 Colo., 202, an alternative writ of mandamus was issued by the supreme court, to which answer was filed. Demurrer was interposed. The demurrer raised 'the question as to whether or not the matters alleged in the answer were issuable in mandamus proceedings. The demurrer was overruled. This was a controversy growing out of a county seat location. The answer to the alternative writ alleged that some sixty-two votes had been rejected from the count by the board of canvassers, which left the result of the election on its face as favorable to Hot Sulphur Springs as the county seat, but denied that the votes so discarded were illegal. The issue was sharply defined and the court asked to determine the true result of the election. The court rendered final judgment on the law and facts in the case. Chapter 32 of the’code of civil procedure of 1877 was devoted to the subject of mandamus. The supreme court held that a proper issue was presented by the pleadings under this chapter of the code. The following excerpts are taken from the opinion:
“The presumption which the law indulges in favor of the conduct of public officers is always liable to be rebutted in a proper proceeding. Whether this be a proper proceeding to test .the validity of the election may, perhaps, depend upon the question whether the laws of the state afforded a plain and ample remedy for contesting the election. Code of Civil Procedure, sec. 302. * * *
‘ ‘ Our statute makes no provision for a contest of an election of this character. No tribunal is provided, and no mention is made of the subject.' The only election contests authorized in counties are those of officers. General Laws, secs. 1013, 1034.
“It is also clear that there is no remedy by quo toar *493 ranto, for that remedy is only employed to test the right to an office or -franchise.—High, Ex. Leg’. Rem., sec. 618; People ex rel. v. Whitcomb, 55 Ill., 172.
“Unless, therefore, the functions of the canvassing officers were of a judicial nature, and their determination as. to the result of the vote partakes of the nature of a judgment, there remains no doubt of the right to inquire into the regularity and validity of their acts in this proceeding.
“What, then, were the powers conferred by law upon the board of canvassers?
“The general rule is that the powers of canvassers are ministerial, involving simply the labor of counting the votes returned, and determining who has received the highest. number. They have a gwisi-judicial power to determine whether the papers transmitted to them are genuine election returns-, but they have no judicial power to reject votes polled. — High, Ex. Leg. Rem.,-sec. 56; McCrary on Elections, secs. 81, 85, and authorities cited.
“Of course, the rule is subject to modification by statute. No statutory modification, however, existed which in any manner changed the rule in the case at bar.
“The conclusion at which we arrive is, that the regularity of the proceeding of the board of canvassers may be inquired into in this proceeding, and if the.result of the election was in fact as alleged in the answer of the respondents, justice and law alike require that the peremptory writ be denied. ’ ’
In that case there was no statute prescribing a forum or method for testing the validity of an election held to locate or remove a county seat, hence no remedy in law to inquire into the validity thereof, but the court clearly held that the charges of fraud and illegal voting alleged *494 in the petition conld be determined in a mandamus pro-^ ceeding, and cites with approval the case of Calaveras County v. Brockway, 30 Cal., 336. The latter case is also founded upon mandamus proceedings, and the facts . therein and in the case of Dean v. County Commissioners, supra, are noticeably similar. Identical questions of law seem to have been raised in both cases, and the courts5 rulings were the same. While nothing was said in the California case as to whether or not the statutes of that state provide a tribunal or proceeding for determining the validity of the election, it can be fairly presumed that no such statute then existed. That opinion sustained the right of the lower court to thoroughly investigate the frauds alleged to have been committed at the election, through mandamus proceedings. ' The court says:
“Assuming, as we think may properly be done, that the Board of Supervisors was the proper authority to canvass the votes cast at the special election respecting the location and establishment of the county seat, and to declare the result of such election, it does not therefore follow that their determination was conclusive, though in the first instance it stands as prima facie evidence that the result was as declared.
“The determination of the Board of Supervisors that the Town of San Andreas had received a majority of all the votes cast is prima facie evidence of the fact so determined, but, like all other prima facie evidence, it must be regarded as open to contradiction; and if the' fact be otherwise than as determined by the Board, it would be an unjust denial of the rights of the electors of the county to shut the door against all remedy for the redress of the wrong. If San Andreas was elected, and thereby established as the county seat of Calaveras County, it was by the expressed will of a majority of the electors who voted, and not by the determination or *495 certificate of the Board of Supervisors. If a false estimate of the number of votes cast for the respective places was made and announced by the Board, whether intentionally or otherwise, justice demands that the injured party or portion of the citizens of the county should have the opportunity of making it manifest, and of having the true result ascertained and determined.”
The following citation is a part of section 389, Mc-Crary on Elections, viz.:
“An adequate remedy will always be found either at law or in equity, for frauds perpetrated against the purity of elections. If the result has been secured by fraud, and the statute has provided no mode of redress, it by no means follows that no redress can be had. ’ ’
Paragraph 9, page 392, vol. 6, A. & E. Enc. of Law, 1st ed., reads as follows:
“While the court will not enjoin the holding of an election, or the canvass of the vote, yet when the election is held to determine questions such as the removal of the county seats, or subscribing to capital stock of corporations,, and there is no provision for contesting the election, it has been held that an injunction may be granted to prevent the officer from doing the act authorized by the election, where it is alleged that the majority was caused by fraudulent or illegal voting.”
Boren v. Smith et al., 47 Ill., 482, was a suit in equity over a county seat location, it being alleged that sufficient fraudulent votes had been cast to change the result of the election as announced. It was sought to enjoin the removal of the county seat as it then existed. The court ruled that the circuit court had jurisdiction under its equity powers to entertain and determine the suit. The court said:
“It was urged that the court below had no juris die *496 tion. to entertain tire bill. It is, no doubt,-true that a court of equity--will never interfere to determine which of two persons has- been elected to an office, or to try the rights of parties to hold an office, as, in such cases the law has afforded adequate and appropriate remedies; still this is not a mere contested election. It is to determine where the citizens of a county have the legal right to transact public business. It is true, it may incidentally involve the question whether the vote has been fairly taken, and if fraud has been committed, to purge the polls. * ' * * And as the constitution, and the law, have failed to afford a specific remedy'to prevent this provision from being defeated, it is eminently proper that equity should afford the requisite relief in such cases.”
People v. Wyant, 48 Ill., 263, was another county seat case, in which the supreme court held that a court of equity had jurisdiction over the case'. The basis of the proceeding was fraud and illegal voting. The court said:
“This is a case unlike a mere contest of two individuals as.to which shall exercise the powers and perform the duties of an office. In that case, the individuals are immediately interested, and the public remotely; but, in this case, it is a matter of public-concern to the people of the county. In that, the law has afforded an ample, remedy, by conforming to the statute authorizing them to contest the election, to determine which is entitled.to the office, while in this, no means are provided by the statute for carrying into effect, the will of the majority under the law, when, apparently, thwarted by fraud, accident or mistake — hence the necessity of equity .to entertain jurisdiction and afford relief.” -
To the same effect: Simpson County v. Buckley, 85 *497 Miss., 713; Cerini v. DeLong et al., 7 Cal. App., 398, 94 Pac., 582; Maxey v. Mack, 30 Ark., 473.
Appellants place great reliance on the case of Dickey v. Deed, 78 Ill., 262. That case does seem to limit the jurisdiction of courts of equity under their former decisions strictly to county seat- cases, and appears to sustain such jurisdiction only because of 'a constitutional provision of that state. However, it is well.to notice .that the only issue before the court in that case was as to the power of a court of equity, under a constitutional provision like ours, to restrain the council from canvassing the returns made to them by the judges and clerks of election. The court denied the jurisdiction, which ruling is in harmony with Vickery v. Wilson (Colo.), supra, and the great weight of authority in this country. Another important and distinguishing feature of that case from •the one at bar is that at the time the proceedings were begun in that case there was a statute of Illinois which provided for contesting the validity of the election Under consideration. The following language appears in the opinion: '
“Thus it is seen there was complete, and, in every way, an ample remedy expressly provided for contesting this election under the statute, but it was not invoked. Hence there, could be no pretense of jurisdiction from necessity. The remedy was obvious, plain and simple in its application, and being ample and complete, there is not the slightest reason why equity should interpose and perform the functions of the county court, where the statute had placed it.”
On this point this case is in harmony with People v. Londoner, 13 Colo., 303.
The case of Gibson v. Board of Supervisors, 80 Cal., 359, arose over an election held at which was submitted the question of issuing bonds to build bridges. The ac *498 tion was in equity and tlie jurisdiction of the court was challenged. It was charged that the returning hoard failed to count a large number of lawful votes, thereby making it appear that a constitutional two-thirds majority had not voted in favor of the issue, while in truth and fact, as alleged, more than a two-thirds lawful majority had voted in favor of issuing the bonds. The court tried the issues and entered its decree setting aside the order of the returning board and declaring the question of issuing bonds had been duly carried. The supreme court sustained the equity jurisdiction of the superior court, and in the opinion we find this language:
“But the main defense set up by appellant is, that no court, by any form of action or proceeding, legal or equitable, has any jurisdiction or authority to inquire into the result of ah election on a question of the issuance of bonds; that the whole matter is beyond "the scope of judicial investigation. It is said that there can be a contest in a court over the election to an office simply because the statute provides a procedure for such a contest; but that as there is no such procedure provided for a contest about any other kind of election,- and as the subject is in its nature beyond the cognizance of courts, therefore there is no judicial jurisdiction of any kind to determine any question rising out of such election. If that position be correct,, then its consequences are far-reaching and alarming. ’ ’
The reasoning in this ease was largely based upon the court’s construction of a constitutional provision concerning the creation of indebtedness by counties only upon the assent of two-thirds of the qualified electors, which provision is quite similar to that of the constitution of Illinois, in force when the opinion was rendered in Dickey v. Reed, supra.
Kennedy v. Warner et al., 100 N. Y. S., 616, was a *499 proceeding wherein one Kennedy sought to restrain the town clerk and others from proceeding under a local option election, claiming that the election was illegal by reason of the absence of a lawful petition preceding the election as required by law. The supreme court of New York (corresponding to our district court) granted the writ of injunction after determining' the - issues. The court says:
‘ ‘ If I am correct in this conclusion it would seem that the plaintiff is entitled to relief in some form. The remedy, however, is not a re-submission at a special town meeting, neither is it mandamus, as that issues to compel the performance of duties which' should have been performed but which have been neglected. It is equally clear that the validity of an election as ter local option cannot be inquired into upon a writ of certiorari. Notwithstanding the plaintiff did not bring this action in behalf of himself and all others interested, I think this court had jurisdiction to restrain the defendants from proceeding in violation of law and to the prejudice of the individual rights of the plaintiff.”
The same court last mentioned, in Raymond, v. Clement, 102 N. Y. S., 1070, decided that, in the absence of a statute providing a method and forum for testing the validity of an election held under a local option statute, the supreme court had jurisdiction under its equity powers granted by the constitution to hear and determine a cause involving the validity of such election. In the case there considered there was a statute providing for the resubmission of the question, in case it had been improperly submitted at the former election. The following excerpt is found in the opinion:
“The only question presented by this appeal is whether the plaintiffs can obtain relief in an action in equity, or must seek redress in the manner provided by *500 section 16 of the liqnor tax law. * * *■' Unless’ the statutory provisions furnish not only a remedy but the exclusive means of righting the wrong complained of, unquestionably a court of equity would have jurisdiction in the premises.”
In the same court may be found another case involving questions arising under a local option election: Ulrich v. Clement, 124 N. Y. S., 133. In that case certain propositions were submitted, under the liquor tax law, to the voters. It was claimed in the petition that the board of inspectors erroneously and falsely certified the result of the vote, and equitable relief was asked for. The supreme court again ruled that under its constitutional power it had full jurisdiction in equity to hear and determine thé case and grant the relief prayed for. The following excerpts are taken from the opinion:
“The defendants * * * contend that plaintiffs have adopted the wrong remedy; that a court of equity has no jurisdiction in the matter, and that even though proposition No. 4 was carried at the town meeting in question, and that the votes properly counted showed that fact, if the inspectors made a false certificate as to the result, certifying that it had been lost, whereas the ballots showed it had been carried, a court of equity has no power to right this wrong, and that the only remedy that the plaintiffs have is to apply for a resubmission of the question at another town meeting.
. “I cannot agree with the learned counsel for defendants in this proposition. If questions under the liquor tax law are properly submitted to the voters at a town meeting and the propositions are carried by a majority of the legal votes cast on those questions, and the inspectors make a false certificate certifying that the propositions were lost, when the votes showed that they were carried, if there.is no law to give an aggrieved party *501 relief -without going through the expensive and uncertain process of resubmitting the questions at another town meeting, it is time there was some authority to correct such a wrong, and the Supreme Court exercising its equity jurisdiction has authority to afford equitable relief in a case of this character if the facts warrant it. N. Y. Const., art. 6, sec. 1. * * * What is wanted in this matter, as in all other similar controversies, is an honest election and an honest canvass of the vote, and then have the result correctly and honestly certified. * * * For the time has not yet come when the Supreme Court is without power to right a wrong if the facts show that a wrong has been committed. ’ ’
Article 6, section 1, of the New York constitution, above referred to, reads partly as follows:
‘ ‘ The Supreme Court is continued with general jurisdiction in law and equity, subject to such appellate jurisdiction of the Court of Appeals as now is or may be prescribed by law not inconsistent with this article.”
Our section 11 of the constitution is fully as broad and far-reaching in conferring jurisdiction on the district court as that of New York which confers jurisdiction on the supreme court. While the case of Innes v. Lansing, 7 Paige (N. Y.), 583, involved matters growing out of a partnership, wherein it appeared that there was some doubt of the jurisdiction of a court of equity, the chancellor used this language:
“I regret that I am obliged to extend the jurisdiction of this court to this new class of cases. But whenever the legislature creates new rights in parties, for the protection and enforcement of which rights the common law affords no effectual remedy, and the statute itself does not prescribe the mode in which such rights are to be protected, this court, in the exercise of its acknowl *502 edged jurisdiction, is’ bound to give to a party the relief to which he is equitably entitled under the statute. ’ ’
The case of Shaw et al. v. Circuit Court, 129 N. W. (S. D.), 907, is a recent and well-reasoned case, wherein the authorities, both pro and con, were reviewed at considerable length. This case was an original proceeding in the supreme court, for a writ of prohibition against the circuit court, to prohibit it from continuing an injunction theretofore granted by said court against the removal of the county records, until the merits of the. contest could be decided. Illegal voting and various acts of fraud on the part of election officials was the basis of the suit. The equity jurisdiction of the circuit court was challenged by petitioner, but the supreme court sustained the circuit court. It seems there was a statute providing for contesting a county seat election. The following excerpts are taken from the opinion, to wit:
“The precise questions under consideration by the court in that case are not disclosed by the record, and. if. the case be considered as holding that a proper and legitimate exercise of purely political power cannot be controlled or interfered with by the courts, it must be conceded that the conclusion reached is sustained by au overwhelming weight of authority. But, where fraud or a total want of power on the part of the political agency employed is involved, the question is an entirely different one, and, where either fraud or want of power appears, judicial decisions are not wanting which hold that courts may interfere with the results of such elections where they may involve the wrongful expenditure of public moneys to the injury of the voters and taxpayers. And authorities even go beyond this where, through fraud, constitutional "provisions may be rendered inoperative or defeated. ” ■
After commenting on cases cited from Washington- *503 and Michigan, apparently against the power of equity to give relief in those cases, the court continues:
“Apparently the Legislature has made no provision for contesting such elections in those states, and the courts there follow the well-settled rule that courts of equity will not review the action of boards or officers where they are wholly political in character. But the reasons given for these decisions are not controlling here, where the Legislature has made election proceedings revieWable by the courts in contest actions. But, even if these decisions may be interpreted as holding that because the acts involved are political in character the courts shall not interfere to prevent the consummation of fraud which may result in defeating the law and the will of the people, we do not wish to be understood as concurring in such views. ’ ’
Section 14, article 5, of the constitution of South Dakota, reads partly as follows:
“The circuit courts shall have original jurisdiction of all actions and causes, both at law and in equity, and such appellate jurisdiction as may be conferred by law and consistent with this constitution.”
In Lanier et al. v. Padgett et al., 18 Fla., 842, another county seat proceeding, an injunction to restrain the county officials from removing the records from the existing county seat was denied by the circuit court, and appeal taken to the supreme court. The petition alleged that the election to determine the location of the county seat was illegal for the want of a sufficient petition. The court said: ■ .
“Under the general prayer of the bill that the members of the Board of County Commissioners be enjoined from making, any order or doing any act in the direction of effecting a change of the location of the county seat and the removal of the county .offices and records by rea *504 soil of tlie result of tlie election, an injunction should have been granted.
£ £ The injunction prayed was not to restrain the members of the board as canvassers of the result of an election, but to restrain them from acting upon the result of an unauthorized election. They would, therefore, be not enjoined from doing what the laws required them to do; but from doing an unlawful act. ’ ’
A portion of section 11, article 5, of the constitution of Florida, reads as follows:
- “The circuit courts shall have exclusive original jurisdiction in all cases in equity, also in all cases at law,” etc. ... . .
Many other cases might be .cited holding to the views expressed in the decisions hereinbefore mentioned, but the list need not be extended. After a careful review of the authorities on both sides of the question, .we conclude. that- sounder logic and more persuasive reasoning predominates.in favor of those authorities which sustain the. jurisdiction of courts of equity in cases of this character, and that such rulings tend to promote honest elections, discountenance fraud, and better protect the general public interests. We therefore hold that in the case at bar, there being no statutory provision for contesting the validity of an election under the local option statute, and it appearing from the record that the election had been entirely completed, and the object of the suit brought was not to restrain or enjoin any official from performing prescribed duties in and about said election; and it further appearing that illegal voting and frauds occurred at said election, whereby the result was changed, the district court, under its general equity powers granted by section 11,' article 6, of the constitution, had power to entertain said action, purge the election of frauds, anil afford such relief as the exigencies of the case seemed to *505 require, and liad power to issue the writ of injunction if supported by the evidence and proofs adduced at the trial.
In reaching the conclusions above expressed, we by no means overlook the fact that many courts of enviable standing in other states have given this subject serious consideration and arrived at conclusions directly opposed to those we have announced. We will not, however, attempt to declare where the weight of authority rests. Notwithstanding many of the opposing authorities are supported by cogent .and forceful reasoning, we feel better content with the reasoning and results of the authorities we have decided to follow. This opinion having been already extended to a greater length than desired, we will not attempt a discussion of the opposing authorities, but append a list of those which seem to be strongest in support of the opposite side of this issue, viz.: Parmeter v. Bourne, 8 Wash., 45; State v. Police Jury, 41 La. Ann., 846; State v. Judge, 13 La. Ann., 89; Hagens v. Police Jury, 121 La., 634; Caldwell et al. v. Barrett et al., 73 Ga., 604; Shrine et al. v. Jackson et al., 73 Ga., 377; Sanders v. Metcalf et al., 1 Tenn. Ch., 419; Harrell et al. v. Lynch et al., 65 Tex., 146; Attorney General v. Supervisors, 33 Mich., 289; Hipp v. Supervisors, 62 Mich., 456; 10 Am. & Eng. Enc. of Law, 816.
We will now give consideration to section 12, article 7, of the constitution. This section in its present wording was incorporated in the constitution at the time of its adoption in 1876. There were only three classes of election contests referred to thérein when adopted, namely, (a) section 3, article 4, refers to contested elections of certain state officers, wherein opposing candidates were contending for the same office, such contests to be determined By the two houses of the legislature-; (b) section 10, article 5, refers to election contests of the members of the house and senate, each body being made the judge *506 of the election and qualification of its respective members; (c) schedule of the constitution, section 13, refers to contested elections of the offices of judges of the supreme, district, and county courts, and district attorney, these contests to be decided by the governor and attorney general, who determine who is entitled to election certificates. These three classes of election contests refer exclusively to disputes between contending candidates for the various offices. ¥e think "the framers of the constitution, in using thé words “the several classes of election contests not herein provided for, ” had in mind similar classes of election contests elsewhere mentioned in the constitution, which only referred to contests for public office. We find no mention in the original constitution of any “election contest” wherein a question is to be submitted to the voters at an election for their approval or disapproval. In 1876 local option laws were but little known, if at all, and it is a fair presumption that the phrase “classes of election contests not herein provided for” had reference only to classes of election contests growing out of a dispute concerning some public office, and could not have referred to or contemplated such an election as we are now considering. Be that as it may, there is nothing in section 12 which in any way qualifies section 11, article 6; hence the power of the district court to exercise its equity jurisdiction granted by section 11 would still remain, regardless of section 12. The general assembly under its plenary power would have authority to enact legislation commanded by that section, even if it were wholly absent .from the constitution. The section can only be considered as a constitutional mandate to the general assembly to do the thing therein commanded, and if the latter body should decline or neglect to act in pursuance of the mandate there is no way known to coerce the legislature into obedience. It cannot be said *507 that section 12 is a limitation upon the power of the general assembly to pass any act concerning’ other ‘ ‘ election contests ’ ’■ than those mentioned therein.
Cooley’s Constitutional Limitations, 6th ed., p. 104, reads as follows:
“In creating a legislative department and conferring upon it the legislative power, the people must be understood to have conferred the full and complete power as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States. The legislative department is not made a special agency for the exercise of specially defined legislative powers, but is intrusted with the general authority to make laws at discretion. ’ ’
Appellants claim that the petition for submitting the anti-saloon territory question to the voters was fatally defective. The court would be well justified in passing this objection by unnoticed, for the reason that a copy of the petition does not appear in the abstract of record. This omission is a clear violation of rule 14 of the •supreme court, to which court this case was originally appealed. However, we will determine the objection on its merits. The first objection to the petition is that it does not appear on its face to have been signed by forty per cent of the qualified electors voting at the last general election in the town of Pagosa Springs. We see no merit in this contention. The evidence clearly shows that at the last general election of the said town of Pagosa Springs, in 1909, the total vote cast was one hundred and thirteen. The petition contains more than enough names purporting to be qualified electors to conform to the statute. There is nothing in the local option act, *508 1907, supra, which, requires the petition to show this fact on its face. Moreover, a form of petition is prescribed in the act, which form is substantially followed by the petition. It was verified and was in substantial conformity with the statute respecting such verification. The statute reads:
“Such petition so verified, or a copy thereof, duly certified as hereinafter provided, shall be prima facie evidence that the signatures, statement of residence, and dates upon such petition, are genuine and true, and that the persons signing same are qualified electors of the political subdivision named.”
Appellants further question the sufficiency of the petition upon the ground that the verification does not state “the residence address of the persons signing’said affidavit, or that such person or persons is or are qualified electors” of the town. This objection has some merit, but we believe the verification substantially conforms to the statute in this respect. A part of the verification reads as follows:
“I, the undersigned elector of the town of Pagosa Springs, do solemnly swear,” etc.
It is true this part of the verification does not use the words.“qualified elector,” and does not state in terms the “residence address” of affiant is Pagosa Springs, but we think the phrase just quoted implies by fair inference that affiant was a qualified elector and that his residence was in that town. No street number or other specific designation of affiant’s domicile is required by the statute to be stated, as would be the case if the town contained a population of over ten thousand people. Appellants further assert that the petition is fatal in that the signers thereof have not therein stated their residence address, and it is not shown therein that they signed the petition not more than ninety days preceding the date *509 of filing tlie same. The petition was filed March 4th, 1910. It contáined three columns, the first headed by the word “name.” In this column all the signatures appeared. The second column was headed by the word “residence,” under which appeared, after each name, the words “Pagosa Springs.” The third column was headed by the word “date,” under which was written, after each name, either a certain date in January or a certain date' in February, but in some instances the year was omitted. As forty-six names were all that was required by the statute to appear on the petition, if those names after which the year was not written be eliminated, there still remain fifty-four names after which the year 1910 is written, therefore the petition is not open to the objection raised. It is obvious from an inspection of the petition that none of the signatures were written thereon more than ninety days prior to its filing. As to the complaint stating facts sufficient to constitute a cause of action, we think there can be no question that it does.
Proceeding now to a consideration of the evidence, twenty-one persons are charged in the complaint as having illegally voted at said election against the town becoming anti-saloon territory. A large number of witnesses-gave testimony at the trial on behalf of both parties, and the court in its decree found that at the election one.hundred and fifty-four votes were claimed to have been cast and counted against the town becoming anti-saloon territory, and one hundred and forty-eight votes in favor of the proposition; but in truth and fact only one hundred and forty-two legal electors voted “no” upon the proposition submitted, while one hundred and forty-five such electors voted “yes;” and by reason of such vote the town lawfully became anti-saloon territory. The decree further found that twelve persons, naming them, had voted at said election against the proposition, *510 who were not qualified electors, and the court eliminated them from the count. It also found that three persons, naming them, had voted at said election in favor of the proposition, who were not qualified electors, and their votes were eliminatéd by the court from the count. We have carefully read all the evidence, and find that in every instance where votes were rejected by the court, as above shown, there was conflict of testimony as to the persons who cast these votes being qualified electors. We may not substitute our judgment as to credibility for that of the trial judge who heard the witnesses and observed their manner and actions while testifying. However, the further lengthening of this opinion by detailed consideration of the evidence and rulings of the conrt as to each voter whose ballot was rejected would be unwarranted.
The trial court, against appellants’ objections, admitted in evidence certain declarations of voters made before and after election tending to disqualify them as legal voters. Of the twelve whose votes were eliminated from the connt, no serious objections to the court’s action were made as to Martine Vargas, Marion Ford and Violet Gordon. Eight of the remainder whose votes were excluded were present and testified at the trial and had an opportunity to dispute the' testimony concerning their alleged declarations, and we think under such circumstances the admission of such declarations has not been held prejudicial.—People ex rel. v. Commissioners, 7 Colo., 190; 15 Cyc., 422. As to the voter Swan Larson, who was not present as a witness, we think it not necessary to determine the doubtful question of the admissibility of his declarations, for two reasons:' (a) There was other evidence before the conrt besides the declarations of Larson, testified to by the witnesses, which would warrant the court in determining his qualifications as a voter; (b) the case was tried to the court without the *511 intervention of a jury, and it will not be presumed that the court gave any weight to testimony not lawfully admissible. As to whether or no't the voter, on the witness-stand, who has cast his vote at an election, may testify as to how lié voted, the great weight of authority is that it is a personal privilege which he may waive at his option; but he cannot be compelled to testify against his will. All the facts concerning the qualifications of the voters whose ballots were excluded by the court were earnestly contested at the trial. The court having resolved such facts in favor of appellees, and there appearing to be sufficient evidence to support the decree, the judgment will be affirmed.
Decided February 10, A. D. 1913.
Rehearing denied March 10, A. D. 1913.

Judgment Affirmed.

Cunningham, P. J., not participating.